John J. SURKO et al., Appellants,

v.

Dan J. HARRISON, Jr., Appellee.

No. 66.

Court of Civil Appeals of Texas.

Corpus Christi.

May 13, 1965.

Rehearing Denied June 2, 1965.

Ralph K. Miller, W. E. Daly, Jr., Simon M. Frank, Houston, for appellants.

Hugh Dunlap, Houston, Leland B. Kee, Davis, Kee, & Mason, Angleton, for appellee.

NYE, Justice.

This is an appeal from a summary judgment in favor of Dan J. Harrison, Jr., the defendant, and against John J. Surko, d/b/a C. B. S. Workover Company, as plaintiff.

The litigation began as a result of the plaintiff, the drilling contractor, suing to recover amounts alleged to be due him under the terms of a written drilling contract for services rendered and equipment and materials furnished, including the costs of certain third party services. The parties will be referred to as they appeared in the trial court.

The decision of this case rests upon an interpretation of the drilling contract and the facts that appear from the depositions of the parties and their witnesses.

Our Supreme Court, in passing upon Rule 166–A, V.A.T.R., has placed the burden of proving that there is no genuine issue of any material fact upon the movant and "All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment." Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952). The trial court that hears the motion for summary judgment must determine if there are any issues of fact to be tried and is not to weigh the evidence or to determine its credi-

bility. Since the motion for summary judgment was granted to the defendant we shall view the plaintiff's position with regard to the rules herein laid down by the Supreme Court. It is, therefore, the obligation of this Court to accept as true all evidence of the plaintiff (the party opposing the motion for summary judgment) Cowden v. Bell, 157 Tex. 44, 300 S.W.2d 286 (1957) which tends to support such plaintiff's contention and to give him the benefit of every reasonable inference which can be drawn in favor of his position. Bolin v. Tenneco Oil Co., Tex.Civ.App., 373 S.W.2d 350, ref. n. r. e.; Valley Stockyards Company v. Kinsel, 369 S.W.2d 19 (Sup.Ct.1963).

The defendant owned and operated an oil and gas lease. He entered into a written contract with the plaintiff to drill an oil well on his lease to 4800 feet. The plaintiff moved his rig on the location and drilled for several days. He exceeded the contract limitation of three degrees from true vertical, whereupon plaintiff plugged the well back some distance, and recommended drilling for eight or ten days until he reached a certain formation at approximately 2900 feet. At this point plaintiff lost the circulation of "returns" of his drilling mud. Plaintiff's drilling crew attempted to regain circulation by operating the mud pump at maximum capacity. When it became apparent that circulation could not be restored the crew attempted to remove the drill pipe from the hole. The sides of the hole caved in and the pipe became stuck. Plaintiff recovered approximately 110 feet of his drill pipe but was unable to loosen, rotate or pull the balance of the drill pipe from the hole. The defendant admitted that the plaintiff's efforts to restore circulation and free the stuck drill pipe were reasonable and necessary under the circumstances.

At this point the testimony was in some instances conflicting. The plaintiff testified that he notified the defendant through his superintendent as quickly as possible. Plaintiff testified that when he finally got in touch with the defendant's superintendent he informed him of the circumstances at the well * * * that a fishing tool company would have to be employed and that "washing over operations would have to be proceeded with." "When he (the defendant's drilling superintendent) called me back the second time and agreed those operations would have to be proceeded with," plaintiff (continuing) stated "well, I asked him (defendant's drilling superintendent) who he thought would be the fishing tool company to send down here. I told him that I knew that he had used Homco and he concurred that Homco, Houston Oil Field Materials Company, was the best company to send down." The plaintiff and the defendant disagreed at this point as to whose responsibility it was under the contract to perform and pay for these special fishing tool services. Plaintiff testified "when Mr. Wear (defendant's drilling superintendent) informed me it was my duty to fish out the pipe, I told him that I didn't quite see how they could figure or could put that interpretation on it. I had never entered into a fishing job of this sort before other than the operator had taken over operations, and he said that he was sorry but the fishing operations would have to proceed. So, I went ahead, after we concurred on the fishing tool company I proceeded to call them and tell them to go down on the job."

The fishing job proceeded for six or seven days. The plaintiff informed defendant's superintendent that the last of the drill pipe was being recovered from the hole and requested instructions relative to continuing with drilling operations. The superintendent told the plaintiff that when they had recovered the fish entirely and the last portion of the drilling string was above the rotary table, to call him back. An hour or so later the plaintiff called back, and the superintendent told him to "plug the well". The plaintiff called his employee, the tool pusher, instructing him to abandon the well and to set cement plugs. Plaintiffs' employee told him that there were some "oil shows on this well" * * * "Aren't they going to run an electric log

on this well." The plaintiff told his tool pusher to stand by while he called the defendant's superintendent Wear, to tell him about the "oil shows" and to see if they wanted to log the well. Wear, the defendant's superintendent, said, "No, the geologists fell like we are too high on the dome or we are not structurally located right," and said, "We don't want to log it, just go ahead and plug it." The well was plugged.

The defendant refused payment of any amount and the plaintiff brought this action, seeking recovery for three separate amounts alleged to be due under the contract: (1) $7,200.00 for the minimum 3000 ft. guarantee (if well was abandoned at the election of the defendant); (2) $5,093.75 for "day work" and (3) $7,935.60 for the fishing expense performed by third party service company, or a total amount of $20,229.35, plus attorney fees of $10,000.00.

The plaintiff contends that he is entitled to recover not less than the sum of $7,200.00 for the minimum guarantee under the terms of the drilling contract unless he has forfeited all rights to compensation for their service and materials furnished as a matter of law because: (1) plaintiff abandoned the contract; or (2) because he "drilled through" an oil show without "due notice" to defendant, which breach was sufficient to cause a forfeiture of all sums due under the contract and that the same was not waived by the defendant.

Before taking up the defensive issues 1 and 2 above we look to the contract to determine if plaintiff is entitled to the minimum amount as contended. In this connection we consider Paragraph 21 of the written drilling contract which is referred to us by both parties.

"21. *If formations are encountered in the drilling of said well which are unusually difficult to penetrate * * * or other formations where returns are lost, * * * Contractor shall, with diligence and skill, make at his risk and expense a reasonable effort to over-* come such a condition and make hole, using modern methods and means adapted thereto for 24 hours * * * so that normal drilling operations can be resumed. If Contractor fails in such effort it shall be relieved of the obligation to drill 4800 feet* and if Owner desires to continue operations in an attempt to penetrate such formation, he shall notify Contractor in writing. For such operations thereafter and until such formation shall have been penetrated and normal drilling operations resumed, or the well abandoned at Owner's election, Contractor shall be paid on the day rate schedule * * * (until) normal drilling operations can be resumed, then further drilling shall be on footage basis as provided under the contract. (emphasis supplied).

"If the hole is lost while attempting to penetrate such formation on day time as provided in the above paragraph, then Contractor shall not be responsible for the loss of the hole * *. In the event the drill pipe is stuck while on day time as provided in this Article 21, * * * then Owner agrees to pay Contractor the applicable day rate plus cutting and fishing tool rental and expense for such reasonable time as is necessary to recover the drill pipe, but Owner shall have the right to direct the Contractor to stop the efforts to recover said stuck drill pipe at any time and pay the Contractor the reasonable value of the drill pipe not recovered."

The defendant admits that he waived the twenty-four hour requirement in paragraph 21 above which required the plaintiff to make at his risk and expense a reasonable effort to overcome the condition encountered in the formation where the returns were lost for a twenty-four hour period. As provided in this paragraph following, if plaintiff was unable to overcome his lost circulation after making a reasonable effort for the time specified he was thereafter relieved of the obligation to drill to the con-

tract depth of 4800 feet. This being so it was incumbent upon the defendant to notify the contractor as to the next operating procedure. The contract provided that plaintiff was to drill to a depth of 4800 feet or "to such other depth at which owner (defendant) elects to abandon the well." At another place the contract stated that plaintiff was to "drill to 4800 feet or to such other depth as owner (defendant) in his sole option and election may request." Still at another place the contract provided that plaintiff "would be paid $2.40 per lineal foot drilled to the depth of 4800 feet *or to such lesser depth as owner may have elected drilling discontinued;* provided contractor (plaintiff) shall be paid for at least 3000 feet even though owner elects to discontinue drilling at a lesser depth." If the defendant's instruction to abandon the well constitutes his election to discontinue drilling, certainly plaintiff would be entitled to the minimum 3000 foot times $2.40, the same being $7200.00, unless defeated by (1) abandonment of contract by plaintiff or (2) a material breach of the contract that was not waived by the defendant.

■ We first look at the question of abandonment on the part of the plaintiff. The defendant testified that his superintendent (Wear) stated that the plaintiff told Wear that when he (plaintiff) got the pipe out of the hole he didn't want to go ahead on the contract, he didn't want to risk losing his string again. This statement was hearsay and is no evidence at all. Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628 (1941). Wear testified that he didn't recall telling anyone that plaintiff had refused to drill the well any further * * * he said * * * "it was assumed" * * * by the defendant's employees that plaintiff didn't want to go on with the drilling of the well. The superintendent Wear's testimony of what the plaintiff told him was a conclusion, not positive or unequivocal. "If a party intends to repudiate a contract before the time for performing it arrives, his declaration of repudiation must be positive, unequivocal, and unconditional in order to

be accepted by the other party to the agreement * * * the party not in default will be justified in treating the contract as repudiated or abandoned only when the other party to the agreement, by his conduct or misconduct, clearly shows a fixed intention to repudiate the agreement and not to comply with its terms in the future. * * * A refusal by one party to perform an independent provision of a divisible contract, or a bona fide controversy over the terms of a contract or the construction to be placed on it and a refusal to perform in a particular manner, is not such renunciation or abandonment as will authorize the other party to treat the contract as rescinded or breached." 13 Tex.Jur.2d 565, § 310.

■ Looking to a reasonable inference drawn from plaintiff's testimony, i. e., his offer to run an electric log to see if the oil show was worthy of further consideration and his report that the string of pipe had been recovered and seeking instructions on how the proceed, does not indicate to us that the plaintiff had abandoned the contract. Plaintiff didn't testify that he was abandoning the well or contract. Plaintiff did testify that he didn't have any personal conversation with the defendant until after defendant's employee, Wear, ordered the well plugged and abandoned and the well was actually plugged. The defendant's testimony was hearsay and his employee's version was indecisive. We hold that there is a fact issue as to whether or not plaintiff repudiated the contract which must be decided at a subsequent trial.

Looking now to the issue as to whether or not plaintiff forfeited his rights under the contract, we must determine from the evidence before us, viewed in the light most favorable to the plaintiff, as to whether or not there was a breach of the contract, and if so, did the defendant waive such breach.

The contract provided that * * * "no oil shows, indications or traces of oil or gas shall be drilled through until owner shall have due notice and an opportunity to have a representative present to specify the na-

ture and scope of such tests as owner may desire." The contract further provided that * * * "should contractor violate any of the terms or provisions of this contract, or if contractor deliberately furnishes false records of well surface such neglect, delay, discontinuance or violation shall of itself be a forfeiture of all rights and claims of contractor under this agreement without any notice or demand by owner."

The defendant argues that the plaintiff breached the foregoing provision and thereby forfeited his rights to any compensation. The plaintiff contends that this is without merit because there were at least disputed fact issues as to whether (1) plaintiff only "encountered" as contrasted with drilling through an oil show so as to breach this provision; (2) plaintiff gave "due notice" thereof to defendant; and (3) any breach thereof was waived by the defendant who with knowledge of the oil show instructed the plaintiff to plug the well and is now estopped to assert any such breach. Both parties cite Ford v. Culbertson, 158 Tex. 124, 308 S.W.2d 855 (Sup.Ct. 1958). The Court said:

"The question of waiver is one of fact for the jury or the trier of the facts where it is a matter of inference. The plaintiffs pleaded waiver and estoppel as a defense and the burden of proof rests upon them to establish such issues by a preponderance of the evidence. A waiver takes place where one dispenses with the performance of something which he has a right to exact, and occurs where one in possession of any right, whether conferred by law or by contract, with full knowledge of the material facts, does or forbears to do something, the doing of which or the failure or forbearance to do which is inconsistent with the right or his intention to rely upon it. 92 C.J.S. [Waiver] p. 1061. Waiver, of course, is a matter or question of intention."

The subject well was one of a series of wells that had already been drilled or were being drilled for the defendant on his lease. The contract depth was 4800 feet. The evidence is void of any testimony by the defendant's superintendent Wear or the defendant himself that they were surprised or shocked to learn of the discovery by them of the reported oil show at the time they ordered the well plugged. It is apparent from the record before us that it was not important enough to the defendant to carry on any extended conversation with the plaintiff at the time the oil show was reported; or important enough to the defendant to make any on the spot check; or to cross-examine the driller as to the extent of such oil show prior to the instructions by the defendant to plug the well. The plaintiff offered to run a log in the well, but the defendant wasn't interested. The contract only required that the plaintiff give "due notice". We hold that the testimony raises a fact issue as to "due notice" and as to waiver. Womack v. Allstate Insurance Company, 156 Tex. 467, 296 S.W.2d 233, (Sup.Ct.1956).

Forfeitures have never been favored by the law, and the courts will decline to strictly enforce such provisions whenever they are against equity and good conscience. Where all the rights of a party to a contract are dependent upon the construction of the term "due notice", our courts would not hesitate to construe such language in the contract to avoid and prevent such forfeiture where the facts warranted it. 13 Tex.Jur.2d § 158, pages 340–43; 25 Tex.Jur.2d § 3, p. 502. Where it is undisputed that notice was given, it should be at least determined by the jury if such notice was sufficient; if not, then a jury question arises as to whether or not the defendant waived such breach.

There is little doubt that in construing the contract from its four corners, the plaintiff is entitled to the minimum lineal feet provision of $2.40 a foot for 3000 feet, unless the plaintiff abandoned the contract,

or committed a breach of the contract that was not waiver, requiring forfeiture of his rights thereunder. These fact issues will have to be determined by a jury.

We do have some doubt as to the ability of the plaintiff to recover the day rate for day work in the amount of $5,093.75 and for the fishing expense in the sum of $7,935.60. The contract provides in paragraph 21 that if the owner (defendant) desires to continue the operations in an attempt to *so penetrate such formation* he shall notify contractor *in writing*.

Of course, upon a trial of the entire case, it may be that the plaintiff as contractor can establish by the evidence that he is entitled to other issues. Only an actual trial of the merits will determine this.

We sustain appellants' points 1 through 4 and reverse and remand the entire case for trial on the merits.

Reversed and remanded.